`IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PATRICIA ASKEW, ) | |
| ) | No. 16 C 2566 |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Magistrate Judge Susan E. Cox |
| NANCY A. BERRYHILL, Acting ) | |
| Commissioner of the U.S. Social ) | |
| Security Administration,[1] ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Patricia Askew ("Plaintiff") appeals the decision of the Commissioner of the Social Security Administration ("SSA") denying her application for Disabled Widow's Benefits ("DWB") under Title II of the Social Security Act ("the Act"). Plaintiff has filed a brief, which this Court will construe as a motion for summary judgment [dkt. 17], and the Commissioner has filed a cross-motion for summary judgment [dkt. 23]. After reviewing the record, the Court grants Plaintiff's motion for summary judgment and denies the Commissioner's cross-motion for summary judgment. The ALJ's decision is reversed and remanded for further proceedings consistent with this opinion.

## BACKGROUND

Plaintiff was born on December 7, 1959. (R. 277.) As a child, she received benefits under Title II on her father's account and benefits under Title XVI. (R. 127). At age thirteen, Plaintiff dropped out of school due to her failure to make academic progress and enrolled in the Arkansas Children's Colony where she was taught homemaking skills, crocheting, and embroidery. (R.

---

[1] Nancy A. Berryhill is substituted for her predecessor, Carolyn W. Colvin, pursuant to Federal Rule of Civil Procedure 25(d).

601; 704–705.) She attended the Arkansas Children's Colony until she attainted age eighteen, at which time a friend assisted her in securing independent housing. (*Id.*) Plaintiff continued to receive benefits under Title II as a disabled adult until she was married in 1991 and her benefits were terminated. (R. 127). [2] Her husband passed away seven years later. (R. 603). She reported that she has lived alone since his death. (*Id.*).

I.   **Procedural History**

Plaintiff filed an application for DWB on November 19, 2009, and an application for Supplemental Security Income ("SSI") on December 5, 2009, alleging an onset date of November 30, 1977. (R. 254–60.) Her applications were denied at the initial stage and upon reconsideration. (R. 98–101.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on August 18, 2011. (R. 66–97; 149–51.) On September 12, 2011, the ALJ issued a written decision granting Plaintiff's application for SSI; however, the ALJ also denied Plaintiff's DWB claim, citing a lack of evidence demonstrating that Plaintiff suffered from a medically determinable physical or mental impairment prior to, or during, her prescribed period for DWB, which ended on August 31, 2005. (R. 102–25.) Upon a timely request for review, the Appeals Council ("AC") vacated the ALJ's decision on February 19, 2013 with respect to Plaintiff's DWB claim and remanded the case. (R. 126–30; 218.) On remand, the AC instructed the ALJ to: (1) update the record and obtain any additional evidence regarding Plaintiff's mental impairments; (2) consider the third party statement submitted by Plaintiff's former teacher; (3) obtain neuropsychological testing and evaluation from a medical expert to clarify the nature of Plaintiff's impairments, including the issue of whether she meets or equals a listing; (4) further evaluate Plaintiff's mental impairments in accordance with the special

---

[2] Generally, a dependent child's social security benefits terminate upon marriage. 42 U.S.C. § 402(d)(1)(D).

2

technique described in 20 C.F.R. § 404.1520a; (5) give further consideration to Plaintiff's maximum residual functional capacity ("RFC") and provide specific references to evidence to support the assessed limitations; and (6) obtain supplemental evidence from a vocational expert ("VE") to clarify the effect of the assessed limitations on Plaintiff's occupational base. (*Id.*) On April 14, 2014, Plaintiff, who was represented by counsel, appeared at another hearing before the same ALJ. (R. 39–65.) Ten days later, on April 24, 2014, the ALJ issued a written decision affirming his finding that Plaintiff was not disabled prior to August 31, 2005. (R. 14–38.) The Appeals Council ("AC") denied review on December 23, 2015, thereby rendering the ALJ's decision as the final decision of the agency. (R. 1–6); *Herron v. Shalala*, 19 F.3d 329, 332 (7th Cir. 1994).)

## II.     Medical Evidence

Prior to 2010, Plaintiff's medical records reveal very little regarding her mental impairments, however on at least one occasion in 2009 it was noted that she suffered from a learning disability and reading disorder. (R. 400.) Other records from the same time period indicate that Plaintiff had a history of obesity. (R. 398; 400; 554.)

On February 2, 2010, three months after Plaintiff filed her initial application for DWB, she and her sister, Molly Scott, completed separate Function Reports where they each described how Plaintiff's conditions limited her activities. (R. 288–303.) Plaintiff and her sister both expressed that Plaintiff had suffered from a learning disability since birth, but that it had not limited her ability to manage her life. (*Id.*) In their respective reports, each indicated that Plaintiff could not read or follow written recipe instructions, but retained to ability to independently prepare meals, clean, travel on public transit, and pay bills. (*Id.*)

One month later, in March 2010, Plaintiff presented to Dr. Michael E. Stone, Psy.D., for a Mental Status Examination related to her claim for disability benefits. (R. 413–16.) Plaintiff reported that she suffered from a learning disability, hypertension, hypercholesterolemia, anemia, concentration difficulties, illiteracy, and stuttering which impaired her ability to obtain and maintain gainful employment. (R. 413.) Dr. Stone noted that Plaintiff could not read and that she had difficultly performing simple calculations. (R. 414–15). Dr. Stone estimated that Plaintiff's intelligence was within the borderline range of intellectual functioning and diagnosed her with adjustment disorder (secondary to learning and medical problems), hypertension, hypercholesterolemia, and anemia. (R. 416.)

On November 12, 2010, Plaintiff presented to Dr. Medeia Gartel, M.D., for a Psychiatric Evaluation. (R. 602–606.) Dr. Gartel noted that Plaintiff had difficultly reading and that it took her several seconds to understand and respond to questions. (R. 603–04.) Based on her examination, Dr.Gartel determined that Plaintiff had a history of learning disorder and possible mental retardation with significant cognitive impairments which required her to seek assistance in many aspects of her life. (R. 605.)

On May 16, 2013, Plaintiff underwent a Psychological Evaluation performed by Dr. Nicolette Puntini, Ph.D., P.C. (R. 702–15.) Plaintiff reported that she had experienced academic difficulties throughout her education, but she particularly struggled in reading class. (R. 704.) Dr. Puntini administered a Wechsler Adult Intelligence Scale-IV ("WAIS-IV") which revealed that Plaintiff had a full scale IQ of 54, suggesting that her overall intelligence fell into the "extremely low range." (R. 710–11.) Dr. Puntini noted that Plaintiff was unable to read simple words such as "in", "hair", and "how" and that she was unable spell words such as "on", "and", and "him." (R. 711.) Plaintiff explained that in the past she had relied on her neighbors or her late husband to

help her read her mail. (*Id.*) At a subsequent visit dated June 9, 2013, Dr. Puntini opined that Plaintiff met Listing 12.04 (Affective Disorders) due to her sadness, unhappiness, depression, and frustration, and Listing 12.05 (Intellectual Disorders) because she had demonstrated deficits in "adaptive functioning" prior to age twenty-two and had a valid full scale IQ of 59 or less. (R. 716–720).

Along with the foregoing evidence, Plaintiff's record also contains an undated letter from Lorraine E. Boone, Plaintiff's former teacher at the Arkansas Children's Colony. (R. 601). In her letter, Ms. Boone indicated that she had she had known Plaintiff for over forty years and that she "wholeheartedly vouch[ed] for [Plaintiff's] personal character." (*Id.*) Ms. Boone stated that Plaintiff could "think socially very well" and carry out verbal assignments, despite the fact that her "academic achievements were minimal" and her reading skills were at a first grade level. (*Id.*) She concluded her letter by stating, "I feel confident in saying that [Plaintiff] is capable of handling most social situation [sic] with thoughtfulness and maturity. I trust [Plaintiff] without reservation." (*Id.*)

### III. Testimony

Plaintiff testified both of her administrative hearings. (R. 39–97.) At her hearing in 2011, Plaintiff explained that she could write "very little" beyond her name. (R. 87–88.) In 2014, Plaintiff testified that during her marriage she would cook, clean, and sometimes grocery shop. (R. 48.) She stated that often she would cook simple meals, and on occasion TV dinners, which did not require her to read cookbook recipes. (R. 49–51.)

### IV. ALJ Decision

On April 24, 2014 the ALJ issued a written determination denying Plaintiff's DWB application. (R. 14–38.) As an initial matter, the ALJ determined that Plaintiff was the widow of

a deceased insured worker, she had attained age fifty, and her prescribed period for DWB ended on August 31, 2005, seven years after the date of her husband's death. (R. 20–21).[3] At step one, the ALJ determined that Plaintiff had not engaged in Substantial Gainful Activity ("SGA") since November 30, 1977, the alleged onset date. (R. 21.) At step two the ALJ found that prior to August 31, 2005 Plaintiff had the following severe impairments: a learning disorder, hypertension, and obesity. (R. 21.) At step three the ALJ determined that prior to August 31, 2005 Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments of 20 C.F.R. Part 404, Subpart P, App'x 1. (R. 21–25.) At step four the ALJ assessed Plaintiff's Residual Functional Capacity ("RFC")[4] and determined that prior to August 31, 2005 Plaintiff had the capacity to perform light work except that she was unable to work at heights, frequently climb ladders, or understand, remember, or carry out detailed and complex job instructions. (R. 25.) He further opined that she was not suited for work requiring intense focus and concentration for extended periods. (*Id.*) At step five, the ALJ concluded that Plaintiff could perform work as a hand packer or cleaner, leading to a finding that she was not disabled under the Social Security Act. (R. 31–33.)

According to the ALJ, the record revealed that Plaintiff's exhibited an intellectual impairment through August 31, 2005, but her impairment did not satisfy the threshold requirement of Listing 12.05 because it was not accompanied by deficits in "adaptive functioning." (R. 21.) Upon review, the ALJ thought that Plaintiff's history of independent

---

[3] Under the Act and regulatory guidelines, the widow of an individual who died fully insured is entitled to benefits if she has attained age fifty and is under a disability. 42 U.S.C. 402 § 202(e). Plaintiff must prove that she was disabled no later than (1) seven years after the insured died or (2) seven years after she was last entitled to mother's benefits or widow's benefits based on disability, whichever occurred last. 20. C.F.R. § 404.335(c). Because Plaintiff has never been found entitled to disabled widow's benefits or received mother's benefits, her prescribed period began on the date of her husband's death in 1998. (R. 20–21.)

[4] RFC is defined as the most one can do despite one's impairments. 20 C.F.R. §§ 404.1545, 416.945.

living and her ability to learn domestic tasks by observation suggested that her functioning prior to August 31, 2005 was at a greater level than the level required by the Listing. (R. 21.) In making his finding, the ALJ paid special attention to the undated letter provided Plaintiff's teacher Lorraine Boone where she described Plaintiff's abilities and reported that she trusted her "without reservation." (R. 23.) Similarly, he gave great consideration to the statements Plaintiff and her sister provided in their Function Reports dated February 2010, detailing that Plaintiff could independently cook, clean, travel on public transit, and pay bills, however he did not discuss her illiteracy. (R. 23.) With regard to the medical opinion evidence, the ALJ accorded only slight weight to the opinion of Dr. Puntini and her determination that Plaintiff met Listing 12.05. (R. 24–25.) The ALJ found Dr. Puntini's 2013 opinion to be contradictory to Ms. Boone's letter and Plaintiff's self-reported abilities. (R. 24.) He also found that Dr. Puntini's opinions revealed greater limitations than the examinations by the State Agency Drs. Gartel and Stone, who evaluated Plaintiff closer to when her prescribed period for benefits ended on August 31, 2005. (*Id.*)

## STANDARD OF REVIEW

The ALJ's decision must be upheld if it follows the administrative procedure for determining whether the plaintiff is disabled as set forth in the Act, 20 C.F.R. §§ 404.1520(a) and 416.920(a), if it is supported by substantial evidence, and if it is free of legal error. 42 U.S.C. § 405(g). Substantial evidence is "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Although we review the ALJ's decision deferentially, she must nevertheless build a "logical bridge" between the evidence and her conclusion. *Moore v. Colvin*, 743 F.3d

1118, 1121 (7th Cir. 2014). A "minimal[ ] articulat[ion] of her justification" is enough. *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008).

### ANALYSIS

Plaintiff asserts that the ALJ made two errors: (1) the ALJ improperly evaluated whether she met Listing 12.05 and (2) the ALJ's RFC assessment was flawed because the ALJ failed to account for her limitations in attention, concentration, and pace.

**A. The ALJ's step three determination is not supported by substantial evidence.**

First, Plaintiff contends that the ALJ failed to properly consider whether she met or equaled Listing 12.05 (Intellectual Disorders) prior to August 31, 2005, the date her prescribed period for DWB ended. Second, she alleges that the ALJ improperly discounted the opinion of examining physician, Dr. Nicolette Puntini. For the reasons that follow, we find that the ALJ did not support his step three determination with substantial evidence.

*1. Listing 12.05*

Listing 12.05 contains two parts: (1) an introductory paragraph which sets forth the definition of intellectual disability, and (2) subparts A–D which set forth four instances where the required level of severity for the disorder is met. 20 C.F.R. Pt. 404, Subpt. P., App 1, § 12.05.[5] An applicant will be found to meet the Listing 12.05 if her impairment satisfies both the introductory paragraph and any one of the four sets of criteria set out in the subparts. (*Id.*) The introductory clause states: "intellectual disability refers to a significantly sub average general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before

---

[5] Earlier this year, the Social Security Administration published amendments to the regulations involving 20 C.F.R. Parts 404 and 416. Revisions to the Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 11, 5844–84 (Jan. 18, 2017), *available at* https://www.gpo.gov/fdsys/pkg/FR-2017-01-18/pdf/2017-00455.pdf#page29. Because the amendments apply only to claims filed on or after March 27, 2017, all references to Listing 12.05 in this opinion refer to the prior version.

age 22." (*Id.*) Plaintiff argues that she meets the requirements of Listing 12.05 because she demonstrated deficits in "adaptive functioning" prior to age twenty-two and satisfies subpart B, which requires a "valid verbal, performance, or full scale IQ of 59 or less." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.05. Neither party, nor this Court, takes issue with the validity of Plaintiff's IQ score; however, upon review, this Court finds that the ALJ failed to consider evidence detailing Plaintiff's illiteracy when he evaluated her deficits in adaptive functioning.

The SSA has not yet defined "adaptive functioning." In the absence of administrative guidance, the Seventh Circuit has applied the definition provided in the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders*, ("*DSM*"), albeit prior versions.[6] Under the current version of the *DSM* ("*DSM-V*"):[7]

> Deficits in adaptive functioning . . . refer to how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background. Adaptive functioning involves adaptive reasoning in three domains: conceptual, social, and practical.

*DSM-V* at 37. The criterion for "adaptive functioning" is met when at least one domain is "sufficiently impaired that ongoing support is needed in order for the person to perform adequately in one or more life settings." *Id.* at 38. Plaintiff concedes that she does not have significant deficits in the social domain based on the letter provided by Lorraine Boone, thus our analysis turns on whether Plaintiff demonstrated deficits in the conceptual and practical domains prior to age twenty-two.

---

[6] *See Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007) (applying the definition of "adaptive functioning" found in the *Diagnostic and Statistical Manual of Mental Disorders*, 4th Edition, Text Revision, DSMV-IV-TR (2000) ("DSM-IV") to the introductory paragraph of section 12.05.). *See also Carradine v. Barnhart*, 360 F.3d 751, 770 (7th Cir. 2004) (citing to and accepting the description of somatization disorder provided in the DSM-IV.).
[7] American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 5th Edition, DSM-V (2013).

Under the *DSM-V*, an adult with mild intellectual disability in the conceptual domain has difficulties "learning academic skills involving reading, writing, arithmetic, time or money management, with support needed in one or more areas to meet age-related expectations." *Id.* at 34. In order to determine Plaintiff's functioning prior to age twenty-two, the ALJ looked to Plaintiff's own allegations of her abilities, the information reported by Plaintiff and her sister in their completed Function Reports, and the statements provided by Plaintiff's former teacher, Lorraine Boone, in her undated letter. (R. 23–24.) While the ALJ relied on portions of these records which described Plaintiff's ability to live independently, use public transportation, cook, and pay her bills, he failed to acknowledge other evidence contained in the same records which demonstrated that Plaintiff was functionally illiterate. In their respective Function Reports, Plaintiff and her sister indicated that Plaintiff did not read and that she could not follow a written recipe. Similarly, Ms. Boone, who had known Plaintiff for over forty years, detailed in her letter that Plaintiff's "academic achievements were minimal" and her reading skills were "on a first grade level." (R. 601.) Moreover, Plaintiff testified at both of her administrative hearings that she had a very limited ability to read. She also reported to Dr. Puntini that she had the difficulty in reading class throughout her education and required the assistance of others to read her mail.

Along with her reading skills, Plaintiff's evidence reveals that she had a limited ability to write. At her 2014 hearing, Plaintiff testified that she could write very little beyond her own name. Ms. Boone also explained that Plaintiff could only carry out verbal, not written, assignments. At her consultative examination, Dr. Gartel noted that Plaintiff could not read, write, or count. In total, this evidence undoubtedly suggests that she required ongoing support to operate at the age-expected levels in reading and writing prior to age twenty-two. While it is true that an ALJ need not mention every piece of evidence in the record, he is "obligat[ed] to consider

10

all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (citation omitted). The fact that the ALJ failed to consider the portions of Plaintiff's medical evidence detailing her illiteracy when he assessed whether she exhibited deficits in adaptive functioning does not assure us that he adequately considered Plaintiff's case. *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (criticizing an ALJ's failure to consider a plaintiff's "strongest piece of evidence supporting" his claim for benefits under a listing.) Accordingly, we must remand this case so that the ALJ can conduct a more thorough step three analysis.

The Commissioner contends that Plaintiff still failed to meet her burden to prove she was disabled prior to the end of her prescribed period for DWB due an evidentiary lack of medical records from the relevant period. (Def.'s Mem. at 2.) This Court recognizes that the period related to Plaintiff's DWB claim is not the same period which is scrutinized under Listing 12.05. As explained above, Listing 12.05 applied to Plaintiff's functioning prior to age twenty-two, i.e. prior to December 6, 1981.[8] In contrast, Plaintiff's DWB claim concerns the seven year period following her husband's death, beginning in 1998 terminating on August 31, 2005. While the evidence does not specifically reveal Plaintiff's functioning during her prescribed period for DWB, it is reasonable to assume that her documented intellectual impairment did not improve after age twenty-two.

First, the *DSM-V* explains that intellectual disability is typically non-progressive after childhood, and a lifelong disorder, which suggests that Plaintiff's disability did not improve during adulthood. *DSM-V* at 38-7–38. Second, Plaintiff's medical treatment which occurred after the end of her prescribed period for DWB indicates that her intellectual disability was a static

---

[8] Plaintiff was born on December 7, 1959. (R. 277.)

11

condition. For example, in 2010, Dr. Michael Stone reported that Plaintiff had difficulty completing simple calculations. Similarly, Plaintiff and her sister both reported that Plaintiff had suffered from a learning disability for her entire life. At her consultative examination, Dr. Gartel noted that Plaintiff could not read well, write, or count. Furthermore, in 2014, Plaintiff's full scale IQ was measured as 54, suggesting that her overall intelligence at the time fell into the "extremely low range." This finding was supported by her inability to read words such as "in" and "how" or spell words such as "on" and "him." When these records are considered in addition to Plaintiff's evidence detailing her abilities prior to age twenty-two, it is reasonable to conclude that her condition persisted in the interim period, encompassing the time relevant to her claim for DWB. *See Warren v. Colvin*, 565 Fed. App'x. 540, 544 (7th Cir. 2014) ("Because intellectual abilities are generally presumed to remain stable over time, the ALJ should have considered" the likelihood that an applicant's IQ scores would remain consistent over an extended period.).

     Because Plaintiff presented medical evidence which supports a finding that she matched or equaled in severity all the criteria specified in Listing 12.05, the ALJ was required to include a discussion of that evidence in his step three analysis. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (stating that the ALJ erred "when he did not evaluate any of the evidence on [a Listing's] required criteria that [was] favorable to [plaintiff].) On remand, the ALJ must consider the impact that Plaintiff's functional illiteracy would have on her abilities in adaptive functioning prior to age twenty-two. Then, he must apply his finding to Plaintiff's prescribed period for her DWB, assessing the consequence, if any, it may have on his disability determination. At this time, the Court offers no opinion as to the other alleged bases of error in the ALJ's decision as raised by the Plaintiff in Docket No. 17.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is granted and the Commissioner's cross-motion for summary judgment is denied. This matter is remanded for further proceedings consistent with this opinion.

Entered: 7/20/2017

_____

U.S. Magistrate Judge, Susan E. Cox